UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VIRGINIA M. ADAMS | * | CIVIL ACTION NO. |
| | * | |
| VERSUS | * | |
| | * | |
| LAKEVIEW MEDICAL CENTER, LLC dba LAKEVIEW REGIONAL MEDICAL CENTER, A CAMPUS OF TULANE MEDICAL CENTER | * * * * | SECTION: |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT AND JURY DEMAND

### NATURE OF THE ACTION

This is an action under Title I of the Americans with Disabilities Act, as amended ("ADA"), the Civil Rights Act of 1991, and the Family and Medical Leave Act ("FMLA") to provide appropriate relief to Virginia M. Adams ("Plaintiff" or "Adams") for unlawful employment acts and omissions committed by Defendant Lakeview Medical Center, LLC dba Lakeview Regional Medical Center, A Campus of Tulane Medical Center ("Defendant" or "Lakeview")

As alleged with greater particularity below, Lakeview discriminated against Adams when it terminated her employment because of her disability, failed to engage in an interactive process to provide a reasonable accommodation for Adams' disability, failed to provide a reasonable accommodation for her disability, and interfered with her rights under the FMLA.

### JURISDICTION AND VENUE

1. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331, because this case involves Federal questions.

2. Venue is proper in this Court because the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of Louisiana.

## PARTIES

3. Plaintiff is a person of majority age residing in Lacombe, Louisiana.

4. At all relevant times, Defendant Lakeview Medical Center, LLC has continuously been a Limited Liability Company domiciled in the State of Delaware with its principal business office in Nashville, Tennessee. Lakeview has its principal business establishment in Louisiana in the city of Covington and is licensed to do business within the State of Louisiana. Defendant Lakeview Medical Center, LLC has continuously had at least 15 employees.

5. At all relevant times, Defendant has been a covered entity under 42 U.S.C. § 12111(2).

## STATEMENT OF FACTS

6. In 2007, Adams started PRN at Lakeview, working with many of the same people that are still working there today. Most employees were aware of Adams' allergies at this time, as it was common knowledge. Shemroske, who was an evening shift tech at that time and who later became the laboratory manager, knew of Adams' allergies.

7. In 2009, Adams became a full-time employee on the evening shift in the lab at Lakeview.

8. In 2012, Adams went PRN at Lakeview and a full-time employee at Ochsner Northshore.

9. In 2015, Adams accepted a supervisor position at Slidell Memorial Hospital and remained PRN at Lakeview.

10. In the summer of 2017, Adams resigned her PRN position at Lakeview.

11. In December 2017, Adams had a job interview for a position in the laboratory at Lakeview with Shemroske and Katie Grams-McGovern. During the interview Adams told Shemroske and Grams-McGovern that she needed an evening shift position because she had a chronic illness that made her sick in the mornings and aggravated her allergy and asthma symptoms. They were already familiar with her allergies and asthma from their previous work experience together. Adams also informed Shemroske and Grams-McGovern that on two days a month she would come into work late in order to get her injections required by her disability. Adams accepted the lead tech evening position on December 14, 2017.

12. Adams is an individual with a disability under the ADA.

13. Adams' related disabilities are allergies, asthma and mast cell disease.

14. On January 15, 2018 Adams began working at Lakeview.

15. In April 2018 Shemroske asked Adams to apply for FMLA to cover her absences and tardiness for doctors' appointments.

16. Shemroske gave Adams a disciplinary action in the form of a written warning for attendance based solely on excess no fault absence points. All of these absences were for doctor's appointments related to Adams' disability or due to illness related to her disability.

17. After Adams' intermittent FMLA was approved both Sedgwick and Shemroske informed her that Adams would have to take time off in increments of 30 minutes.

18. Lakeview's time keeping is tallied in 15-minute increments.

19. Shemroske informed Adams that she was not allowed to use her intermittent FMLA to call in late on the days when Adams was sick in the mornings and that Adams would continue to accrue no fault attendance points.

20. Throughout her time at Lakeview during 2018-2019 there were several types of accommodations that Adams discussed with Shemroske. One was a reduced schedule of either shorter workdays, fewer days a week, or a slightly later shift. This was brought up with Human Resources, and the COO. They stated that Shemroske was already "working" with Adams by pushing the shift back from 10:30 to 11:00 and that should be enough. That was no accommodation because Shenroske told Adams in the initial job interview that the shift would either be 10:30 - 7, or 11:00 - 7:30. Adams' request for accommodation for her disability was unreasonably denied by Lakeview.

21. The second accommodation requested by Adams was to rearrange the workstation where she worked to be more ergonomically correct, since with her increased level of inflammation Adams is prone to repetitive stress injuries. Too much twisting causes inflammation in Adams' legs, which causes her leg pain. Adams was reprimanded several times by Shemroske for changing and moving to many "things" in her work area. Adams would move supplies to accommodate her reach or to reduce having to twist from one work counter to another. When Adams would return to work the next day, the materials would be replaced in their original positions. This went on for months. Again, this request for an accommodation was denied by Lakeview.

22. A third accommodation was to request that the small portable container of scented air freshener spray not be used in the bathroom since Adams am allergic to fragrances. Shemroske's response to that request was to place a work order to have an automatic air freshener dispenser installed in the laboratory bathroom. This is another example of Lakeview unreasonably denying an accommodation request by Adams.

23. During her time under Shemroske at Lakeview, she repeatedly asked her if Adams would step

down from her lead tech position because "you are sick." Shemroske also asked Adams if, because she was sick, she would take a position across the lake at Tulane Hospital since they had dedicated Blood Bank staff.

24. Adams was hired as Lead Tech responsible for the Serology and Urinalysis department. Adams was cross trained in all areas of the laboratory in order to help cover lunches and scheduled absences in other departments. There was never a time when Adams was working in her regular position when she was the only technologist able to perform Blood Bank testing. There were only a few days in her time at Lakeview where Adams was scheduled to work as the Blood Bank technologist.

25. On July 29, 2019, Adams worked her regular scheduled shift in Serology and Urinalysis. Adams woke up that morning with a flare up of her allergy symptoms. Pursuant to medical direction from her physician, Adams began taking Benadryl, 50mg every four hours with a starting dose of 100mg, in addition to her regular medications at 5 am. Adams had been performing her work in Serology and Urinalysis on a busier than normal evening without any issues, even though Adams was not feeling well. At approximately 5:00 pm, Shemroske asked Adams to take over in Blood Bank. Adams informed her that she was not feeling well and had been taking Benadryl. Adams asked if the other technician Marsha Aucoin, who was experienced in working in the Blood Bank, could take over instead. Aucoin initially had refused to go to Blood Bank when Shemrosk asked her, but she agreed to go when Shemroske asked her again. Aucoin then worked the Blood Bank and Adams worked Aucoin's department in Chemistry as well as her own area. This arrangement was not new and had occurred several times before.

26. Shemroske was well aware of Adams' disability and of the fact that Adams routinely took

5

Benadryl at work.

27. At about 5:30 pm that same day, Adams had been working in Chemistry, Serology, and Urinalysis for approximately 30 minutes when Shemroske asked her to come into her office. She then informed her that she was sending her home because Adams had admitted to being under the influence of Benadryl. Adams was shocked at being sent home for taking a medication for her disability.

28. Adams returned to work the next day July 30th and worked her shift without incident. Adams emailed the CEO that day about the events of the previous evening.

29. On July 31, 2019, Shemroske placed Adams on administrative leave while the incident was being investigated.

30. On August 9th, Shemroske and Chris Atkinson fired Adams for violating Lakeview's substance abuse policy.

31. However, Adams did not violate the substance abuse policy. This reason given by Lakeview for termination is false and a pretext for discrimination based on Adams' disability.

32. Under paragraph 3.c. of the policy medications prescribed by a physician and taken as prescribed are not prohibited under the Substance Abuse Policy. Adams was taking Benadryl that day as prescribed by her physician, Dr. Olivier.

## STATEMENT OF CLAIMS

33. Defendant terminated Adams in violation of the ADA.

34. More than thirty (30) days prior to the institution of her lawsuit, Adams filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the ADA by Defendant.

35. On August 10, 2020, the EEOC issued a Notice of Suit Rights to Adams and this lawsuit was filed within 90 days of receipt of the notice.
36. All conditions precedent to the institution of this lawsuit have been fulfilled.
37. Adams has at all times relevant been a qualified individual with a disability under the ADA because she has (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of a substantially limiting impairment; and/or she was (3) being regarded as having a disability by the Defendant.
38. Adams suffers from Mast cell disorder, allergic disorder, and asthma.
39. Adams' Mast cell disorder, allergic disorder, and asthma substantially limit her major life activities of working, walking, eating and beathing and her major bodily function of her immune system.
40. Adams has had the following symptoms from her disability: fatigue, facial flushing, itching, hives, tachycardia, abdominal cramps, lightheadedness, inflammation, leg pain, vomiting, diarrhea, and migraine headaches.
41. During all relevant periods, Jennifer Olivier, MD, Adams' physician, has prescribed eight medications to be taken from one to four times daily to alleviate the symptoms of Adams' disability. Dr. Olivier also prescribed the over-the-counter medication, Benadryl, to be taken as needed.
42. Adams' job duties as the lead lab technician included supervising the lab technicians, conducting low complexity testing, conducting moderate complexity testing and conducting high complexity testing.
43. Defendant regarded Adams as having a disability.
44. Adams' Mast cell disorder, allergic disorder, and asthma are all disabilities under the

7

ADA.

45. Defendant were aware that Adams had a disability.
46. Shemroske allowed non-disabled employees to adjust their schedules for such activities as doctor's appointments, home repairs, and kids school functions, without giving them no fault absence points.
47. Shemroske charged no fault absence points to Adams for her doctors' appointments.
48. Some non-disabled employees were late without giving any notice and Shemroske would not tally no fault absence points against them. This had been common practice for many years.
49. Shemroske would charge no fault absence points to Adams for being late to work, even when Adams gave notice and even when the lateness was caused by her disability or an illness related to her illness.
50. Adams was able to perform the essential functions of her job with accommodation.
51. Defendant failed to engage in an interactive process with Adams to determine what reasonable accommodation was available to allow Adams to perform the essential functions of her job.
52. Defendant unlawfully terminated Adams' employment because of her disability.
53. Adams was an eligible employee under the Family and Medical Leave Act ("FMLA").
54. Lakeview is subject to FMLA requirements.
55. Adams was entitled to leave under the FLMA.
56. Adams gave proper notice of her intention to take FMLA leave.
57. Lakeview denied Adams benefits to which she was entitled under the FMLA.

58. Adams was prejudiced by Lakeview's denial of her benefits.
59. Lakeview violated the Family and Medical Leave Act when it accounted for the Adam's intermittent leave using an increment greater than the shortest period of time that the it used to account for use of other forms of leave. This caused Adams to use more of her PTO and FMLA than was necessary, which resulted in Adams running out of PTO.
60. Lakeview violated the Family and Medical Leave Act when it charged Adams no fault attendance points after Adams informed Shenroske that she was taking FMLA for the absence. This resulted in Shemroske taking disciplinary action against Adams. This disciplinary action was used as a reason to terminate Adams.
61. Lakeview violated the Family and Medical Leave Act when it fired Adams when she was on intermittent FMLA leave.
62. The alleged non-discriminatory reason for firing Adams given by Lakeview, that Adams violated the substance abuse policy is false and a pretext for discrimination.
63. Adams was never drug tested and was never given the opportunity to provide a legitimate medical explanation, such as a physician's prescription.
64. Benadryl is not prohibited under the policy because it was taken as prescribed under the direction and monitoring of Dr. Olivier.
65. Actually, it was Lakeview that violated the substance abuse policy when it failed to restrict Adams or recommend an accommodation with regards to the working as a Blood Bank technologist. After Adams volunteered the information that the medication Benadryl could affect Adams' ability to perform the duties as a Blood Bank technologist on that particular day, Lakeview did not enter into an interactive process to fulfill its duty to provide reasonable accommodation for Adams' disability.

66. Adams did not violate the provision of the policy that requires an employee to notify her supervisor whenever she is taking a prescribed or over-the-counter drug that may impair her job performance. On the contrary, as soon as Adams believed that taking Benadryl would affect her ability to do her newly assigned duties, she told Shemroske that fact in compliance with the policy.

67. Instead of accommodating Adams' need for medication for her disability, Lakeview fired her.

68. Also, Adams had been taking Benadryl for years and, prior to this day, it had not impaired her job performance. In fact, Adams had worked for 6 hours without incident on the day in question.

69. The unlawful employment practices complained of herein were intentional.

70. The unlawful employment practices complained of herein were committed with malice or with reckless indifference to Adams's federally protected rights.

71. The unlawful employment practices complained of herein have caused Adams to suffer economic injuries, including but not limited to lost wages, as well as non-pecuniary injuries.

72. The unlawful employment practices complained of herein have caused Adams to suffer emotional distress, pain and suffering and loss of reputation.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

A.  Grant a permanent injunction enjoining Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from accounting for an employee's intermittent leave using an increment greater than the shortest period of time that the it uses to account for use of other forms of leave.

B.  Grant a permanent injunction enjoining Defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from charging an employee no fault attendance points or taking any disciplinary action against that employee for absences taken under the FMLA.

C.  Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices.

D.  Order Defendant to make whole Adams by providing appropriate backpay and loss of benefits with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

E.  Order Defendant to reinstate Adams or to make her whole by providing her with front pay, in amounts to be determined at trial, to eradicate the effects of Defendant's unlawful employment practices.

F.  Order Defendant to make whole Adams by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

G.  Order Defendant to make whole Adams by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including but not limited to emotional and mental anguish, pain and suffering, humiliation, loss of enjoyment of life, and devastation in amounts to be determined at trial.

H.   Order Defendant to pay Adams punitive damages for its malicious and reckless conduct, as described hereinabove, in amounts to be determined at trial.

I.   Award attorney fees and costs in this action.

J.   Grant such further legal or equitable relief as the Court deems necessary and proper.

## JURY TRIAL DEMAND

In accordance with Rules 38 and 39 of the Federal Rules of Civil Procedure, the Plaintiff hereby requests a jury on all issues raised in the instant Complaint which may be tried by jury.

Respectfully submitted,

*Victor R. Farrugia*
Victor R. Farrugia No. 19324
FARRUGIA LAW FIRM, LLC
1340 Poydras Street, Suite 2100
New Orleans, LA 70112
Telephone: (504) 525-0250
Facsimile (504) 293-0651
vfarrugia@farrugialawfirm.com

Please serve:

Lakeview Medical Center, LLC
Through its
REGISTERED AGENT
FOR SERVICE OF
PROCESS:

CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816